UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
ANTOINE WILLIAMS,

                              Plaintiff,

            v.

FOUR SEASONS SOLAR PRODUCTS LLC,
BRIAN FABIAN, ROBERT DORSCH, KATHY
KUROLY, DAWN HART, MARIE SOBEL, and
MIKE PERRY,

                              Defendants.
-----------------------------------------------------------------------X

<u>For Online Publication Only</u>




**MEMORANDUM & ORDER**
14–cv–3581 (JMA) (AKT)

**Appearances:**

David D. Barnhorn
Alexander T. Coleman
Michael J. Borrelli
Borrelli & Associates PLLC
1010 Northern Blvd – Suite 328
Great Neck, NY 11201
            *Attorneys for plaintiff*

John K. Diviney
Jacqueline K Siegel
Greg Mann
Rivkin Radler LLP
926 RXR Plaza
Uniondale, NY 11556
            *Attorneys for defendants*

**AZRACK, United States District Judge:**

In this action, plaintiff Antoine Williams brings claims against his former employer and six former co-workers and supervisors arising out of two distinct sets of facts. First, plaintiff brings claims under the New York Labor Law and the Fair Labor Standards Act related to his compensation. Second, plaintiff brings claims for discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the New York Human Rights Law.

Before the Court is defendants' motion for summary judgment on all of plaintiff's claims. For the reasons that follow, the Court grants defendants' motion with respect to plaintiff's compensation claims and claim for discriminatory termination. The Court denies the remainder of defendants' motion because there are genuine issues of material fact with regard to plaintiff's hostile work environment and retaliation claims.

## I. BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements and the exhibits accompanying their motion papers. Where the parties dispute material facts, such dispute is noted.

### A.    <u>Plaintiff's Employment at Four Seasons</u>

Defendant Four Seasons Solar Products LLC ("Four Seasons") is a company engaged in the manufacture and sale of "sunrooms, windows, and door products throughout the United States and North America" with its offices and manufacturing facilities in Holbrook, New York. (Plaintiff's Counter-Statement of Undisputed Facts ("Pl's 56.1") ¶¶ 2, 38, ECF No. 52; <u>see also</u> Declaration of Brian Fabian ("Fabian Dec.") ¶ 4, ECF No. 51-51.) Plaintiff was employed by Four Seasons during three separate time periods: first, from September 2001 until October 2006; second, from "in or about 2008" until March 2009; and, third, from October 28, 2009 until April 17, 2013. (Pl's 56.1 ¶ 1; Fabian Dec. ¶¶ 6, 7.) This action concerns plaintiff's employment during the last of these three periods.

During the relevant time period, the individual defendants held the following titles at Four Seasons: Brian Fabian held the title of "Senior Vice President;" Robert Dorsch held the title of either "Customer Service Manager" or "Engineering Customer Service Manager," Marie Sobel held the title of "Human Resources Manager," Dawn Hart held the title of "Senior Buyer Planner;"

Kathy Kuroly held the title of "Customer Service Representative;" and Mike Perry held the title of "warehouse worker. " (Pl's 56.1 ¶¶ 3–8.)

During the relevant time period, plaintiff was paid an annual salary of $53,040, consisting of bi-weekly payments of $2,040.  (Id. ¶ 14.)  Pursuant to New York State Labor Law § 195.1, plaintiff received "Notice and Acknowledgement of Pay Rate and Pay Day" in 2012 and 2013 indicating that he was a salaried employee paid on a bi-weekly basis.  (Id. ¶¶ 15–18; see also Williams Dep. 24:3–24, ECF Nos. 51-5, 52-2; Signed 195.1 Statements, ECF No. 52-8.)

Defendant Dorsch was plaintiff's direct supervisor throughout the relevant time period, but the record is unclear with regard to (a) the regularity with which Dorsch gave plaintiff direct assignments, (b) whether Dorsch possessed the authority either to hire or fire plaintiff, and (c) whether Dorsch possessed the authority to determine plaintiff's salary.  (Pl's 56.1 ¶¶ 27–32; see Sobel Dep. at 21:9–15 (plaintiff's pay was set by "a combination" of Dorsch and Fabian but "if anything it would be more Mr. Fabian"), ECF Nos. 51-43, 52-9; Fabian Dep. at 14:9–19; 15:10–15 (Dorsch "was responsible for giving plaintiff work assignments," but Fabian would occasionally provide assignments), ECF Nos. 51-46, 52-10.)  Dorsch did not have the authority to set plaintiff's work hours, was not responsible for maintaining plaintiff's employee records, and was not responsible for developing employment policies that were applicable to plaintiff.  (Pl's 56.1 ¶¶ 34–36.)

### 1.    Plaintiff's Testing and Certification Responsibilities

Many of plaintiff's responsibilities centered on obtaining the proper safety and quality certifications for Four Seasons' products.  Each jurisdiction in which Four Seasons operated had different certification requirements, and compliance with those requirements was often necessary "[i]n order for Four Seasons to sell its products, to advertise, and to effectively compete" because,

in many jurisdictions, Four Seasons "may not legally sell its products without the requisite certification." (Id. ¶¶ 39, 43, 45; see also Williams Dep. 61:5–24.) The parties thus agree that "[m]anaging the certification of Four Seasons products is a very important function for Four Seasons." (Pl's 56.1 ¶ 42.)

Plaintiff concedes that he was "the primary employee at Four Seasons who was responsible for ensuring that Four Seasons products received proper certification," that he performed duties concerning those responsibilities "on a daily basis," and that he "took a leadership role at Four Seasons" in this area. (Id. ¶¶ 55, 57, 71, 78; see also Williams Dep. 62:6–17; 95:3–19.) Dorsch and Fabian testified that plaintiff spent "80 percent" and "60 to 70 percent" of his time on such tasks, respectively. (Dorsch Dep. 25:23–26:9, ECF No. 51-44; Fabian Dep. 62:23–63:3.) Plaintiff testified that these duties required "independent judgment" on his part based upon his "knowledge" and "skill." (Williams Dep 95:11–19.)

 In a resume that he prepared in 2013, plaintiff noted that he was responsible both for "[m]anag[ing] all third party testing" for Four Seasons and for obtaining certifications from government agencies based on the results of such testing. (Williams Resume, ECF No. 51-12; see also Pl's 56.1 ¶¶ 52, 81–84, 86–88.) Plaintiff's responsibilities included making decisions such as (a) which level of certification to seek for a given product, (b) whether to modify an existing product in order to meet certification requirements, and (c) which testing lab would be hired to run the relevant tests. (Williams Dep. 63:15–65:24.) As part of this process, plaintiff was responsible for interpreting and understanding both the performance characteristics of Four Seasons' products and the relevant codes and criteria. (Id. at 67:4–68:9.) Plaintiff interacted directly with third-party laboratories to discuss how to achieve Four Seasons' certification goals and was responsible for soliciting price quotes and signing agreements with the laboratories after

obtaining internal approval.  (Pl's 56.1 ¶¶ 61, 73–75.)  When necessary, plaintiff would also conduct on-site visits at the laboratories as a representative of Four Seasons.  (Id. ¶¶ 90–92; see also Williams Dep. 74:3–11.)  Finally, plaintiff was responsible for resolving any issues that arose during the testing process and would bring issues to the attention of the manufacturing group at Four Seasons, when necessary.  (Pl's 56.1 ¶ 80.)

When plaintiff assumed these testing and certification duties in 2009, "no other employee at Four Seasons had knowledge and expertise regarding the specialty testing and certification of the Company's products and, therefore, Plaintiff self-learned on his own and through his interactions with third-party vendors, testing laboratories, and certification bodies."  (Id. ¶ 59.)  Plaintiff's role thus "entailed a research and development function" that led him to "develop[] a knowledge base and independent expertise regarding the process by which tests of Four Seasons sunroom, window, and door products were validated by third-party entities."  (Id. ¶¶ 60, 85.)

Plaintiff's testing and certification responsibilities were subject to the oversight of Senior Vice President Brian Fabian, and plaintiff kept Fabian informed of relevant developments and would often seek Fabian's approval for specific decisions.  (See, e.g., Williams Dep. 65:18–24; 66:8–67:3.)  Plaintiff exercised considerable autonomy, however, and "did not wait to receive assignments or take cues from Fabian or other Four Seasons employees before ensuring that all steps were being taken to secure proper certification of Four Seasons products."  (Pl's 56.1 ¶ 70; see also Williams Dep. 66:8–67:3.)

### 2. Design Responsibilities

Plaintiff also had certain responsibilities related to the design of Four Seasons products. (See Williams Resume.)  For instance, plaintiff designed "bi-fold doors" sold by Four Seasons. (See Pl's 56.1 ¶ 101; Fabian Dep. 76:3–20.)  Plaintiff "worked on the design and development of

the bi-fold doors project on a daily basis" over a six month period and spent about 30% of his time on the project during those six months. (Pl's 56.1 ¶ 105; Fabian Dep. 68:2–5.) Plaintiff also "designed extrusions on door products that were necessary to achieve certain performance levels in testing by third-party laboratories" and "made decisions about how to fit the extrusions . . . around the primary parts . . . of the bi-fold doors." (Pl's 56.1 ¶ 107, 109; Williams Dep. 48:17–20.) Plaintiff also designed "the exterior siding" of another Four Seasons product, exercising similar levels of independent judgment. (Pl's 56.1 ¶ 115.) In addition, plaintiff was "responsible for the design and layout of custom rooms and components ordered by Four Seasons dealers that were outside the scope of [Four Season's] standard product offerings," but spent "less than ten percent of his time" on such work. (Id. ¶¶ 120; 268.)

Plaintiff's supervisors occasionally gave him the responsibility for designing modifications to certain products in order to improve performance, requiring plaintiff to "use[] his judgment as to the correct modification necessary." (Id. ¶¶ 121, 122; see also Williams Dep. 57:15–58:10.) Finally, plaintiff was responsible for evaluating and approving samples received from the vendors engaged by Four Seasons to manufacture its products. (Pl's 56.1 ¶¶ 124, 125.)

### B.    Plaintiff's Claims of Discrimination

Unlike plaintiff's compensation claims, plaintiff's discrimination claims rest on facts that are almost entirely disputed. As such, the Court first sets out the background facts and then notes areas of dispute.

Four Seasons conducts mandatory discrimination and anti-harassment training for its employees and maintains an anti-discrimination policy that, among other things, establishes a complaint procedure and bars retaliation against employees who complain about discriminatory or harassing conduct. (Pl's 56.1 ¶¶ 131–134.) Plaintiff received a copy of this policy and, prior to

the incidents at issue here, had never complained of discrimination or harassment.  (Id. at ¶¶ 133, 135.)  Indeed, plaintiff testified that he "got along" with his co-workers and considered many of them to be "friends" or "good friends."  (Williams Dep. 109:6–12; Pl's 56.1 ¶¶ 197–204.)

On January 3, 2013, plaintiff injured his back while working on bi-fold doors.  (Pl's 56.1 ¶ 148.)  Plaintiff's injury appears to have lingered and he took sporadic time off between the date of his injury and February 18, 2013.  (See id. at ¶¶ 151–155.)  On February 19, 2013—his first day back at the office after his injury—plaintiff complained to Fabian and Human Resources Manager Marie Sobel that his co-workers were using the word "nigger" in the office.  (See id. at ¶¶ 156–159, 163–166.)  Fabian drafted an incident report outlining plaintiff's complaint and, at Sobel's request, plaintiff submitted a written complaint letter.  (Id. at ¶¶ 160, 168, 171; see also Fabian Incident Report, ECF No. 51-35; Williams Complaint Letter, ECF No. 51-36.)

In his complaint letter, plaintiff stated that he had "experienced racial discrimination when a hostile work environment developed" over the previous three months and detailed a number of incidents in which Four Seasons employees had allegedly made racially derogatory comments either directed at him or in his presence.  (Williams Complaint Letter.)  A few days later, plaintiff again complained to Sobel, stating that his co-worker John Morgan used a song including a racial slur as his cell phone ring tone.  (Pl's 56.1 ¶ 179.)

In short, plaintiff's letter and subsequent deposition testimony state that he was subjected to racially derogatory behavior on numerous occasions by defendants Dorsch, Kuroly, Hart, and Perry, as well as other employees.  As described below, plaintiff's co-workers dispute nearly all of his allegations.  Because the facts underlying plaintiff's hostile work environment claim are subject to genuine dispute, the Court does not set out each of those disputed facts in detail.

1.   **Investigation**

After plaintiff filed his written complaint, Four Seasons initiated an investigation. (Id. ¶ 171; Sobel Dep. 45:3–14.)  On February 20, 2013, Fabian met with a number of employees and advised them that Four Seasons did not tolerate discrimination or harassment.  (Pl's 56.1 ¶¶ 176, 177.)  In the following days, Sobel and Fabian separately interviewed 12 employees, including all of the other individual defendants.  (Id. at ¶ 180.)  Every employee interviewed denied ever hearing, observing, or making any racially charged comments directed at plaintiff and, in general, contradicted nearly all of plaintiff's allegations.  (Id. at ¶¶ 181–182.)  The following are the only two instances in which plaintiff's allegations were substantiated by other employees.

First, defendant Perry admitted that, outside of plaintiff's presence, he would occasionally call his co-worker and friend John Morgan "nigga," explaining that it was "friends talking to friends joking around."  (Perry Dep. 15:23–16:6, ECF No. 51-42.)  Sobel and Fabian directed Perry to stop saying "nigga," even in jest, and the parties agree that Perry has not said it since.  (Pl's 56.1 ¶ 193; see also Perry Dep. 21:24–22:5.)  Second, the investigation revealed that Morgan's cell phone ringtone was, indeed, a song that included a racial slur, although there is some dispute as to which song was set as the ringtone.  (Pl's 56.1 ¶ 236; Morgan Dec. ¶ 10, ECF No. 51-55; Williams Dep. 239:2–8.)  Morgan was verbally reprimanded and was told to change his ringtone.  (Pl's 56.1 ¶ 238; Sobel Dep. 91:10–15.)

All interviewed employees denied that any other discriminatory incidents ever occurred. After completing the investigation, both Sobel and Fabian concluded that the interviewed employees were credible and that plaintiff's complaints were baseless.  (See Pl's 56.1 ¶ 181; Investigation Reports, ECF No. 52-12; Fabian Dep. 111:18–23; Sobel Dep. 140:5–11.)  In early March, plaintiff met with Sobel and Fabian to discuss the results of the investigation.  Fabian

testified that he and Sobel told plaintiff that no one had corroborated his claims.  (Fabian Dep 113:20–114:3.)  Plaintiff did not have an independent recollection of being told about the culmination of the investigation, but does not deny that the meeting occurred.  (See Pl's 56.1 ¶ 244; Williams Dep. 268:18–271:21.)

The record also contains the deposition testimony of Dr. Vasantha Badhey, plaintiff's treating physician.  (See Badhey Dep., ECF Nos. 51-45, 52-16.)  Dr. Badhey did not begin treating plaintiff until nearly a year after the events at issue here, but she believes that plaintiff suffers from a schizoaffective disorder, the main conditions of which are paranoid delusions, visual or auditory hallucinations, and depression.  (Id. at 40:9–17; 52:14–53:4.)  Specifically, Dr. Badhey testified that it is her belief that plaintiff's claims that he had heard his co-workers make racially derogatory comments may have been the result of hallucinations.  (Id. at 48:2–19; 52:8–23.)

### 2.    Post-Investigation

On April 12, 2013—approximately a month after the conclusion of the investigation— plaintiff approached a group of employees that included defendants Hart and Perry.  (Williams Dep. 297:24–298:6.)  Plaintiff testified that Hart looked at him and said "they're gonna kill [plaintiff] this weekend" and, shortly thereafter, Perry made a comment about "Mylo," plaintiff's dog.  (Id. at 298:7–13.)  Plaintiff testified that he was angry and told Hart "I heard you," after which Hart called Fabian and Sobel.  (Id. at 298:13–21.)

Hart's testimony conflicts with plaintiff's account of the April 12 incident.  Hart testified that she was discussing a sales order with a group of co-workers when plaintiff approached them and said: "I know what you are saying.  You are playing a game."  (Hart Depo. 43:20–22, ECF No. 51-40.)  Hart tried to explain that the group was not talking about him and then called Fabian because she had previously agreed to contact Fabian "if anything bothered" plaintiff.  (Id. at 43:22–

9

44:5.)  Hart told Fabian that "something is wrong" with plaintiff and that she "could see he was irritated."  (Id. at 45:6–9.)

Fabian and Sobel immediately went to see what had happened, and plaintiff told them that he had overheard his co-workers say that they were going to kill him and his dog.  (Fabian Dep. 137:18–24; Sobel Dep. 151:8–12.)  Believing that he needed to investigate allegations of such a threat, Fabian called the police.  (Fabian 141:4–14; Williams Dep. 302:12–18.)  When the police arrived, plaintiff told them that "his co-workers are speaking about him behind his back and plotting to harm both he [sic] and his dog."  (Police Report, ECF No. 51-38.)  The police report stated that plaintiff was "very upset," but that "no direct threat or racial slur was ever made to him" during this incident.  (Id.)  The police asked whether he was "on medication," and he responded that he was not.  (Williams Dep. 304:2–3.)  Fabian testified that plaintiff was "agitated" and repeatedly asked whether he was being fired while "sweating and pacing and not looking [Fabian] directly in the eye."  (Fabian Dep. 142:3–14.)  Fabian told plaintiff that he was not being fired but that it "would be best if [he] went home, calmed down, [and] relaxed."  (Id. at 142:5–14.)  Plaintiff repeatedly stated that he was "not quitting" but, at Fabian's insistence, went home.  (Williams Dep. 304:9–12; 307:10–12.)

On the following day—Saturday, April 13, 2013—plaintiff testified that he was walking his dog and heard a neighbor say "you're dead" to him.  (Id. at 311:13–16.)  Plaintiff also testified that "white . . . kid[s]" in his neighborhood told him that he "is dead."  (Id. at 313:3–314:12.)  Plaintiff further testified that another white neighbor "came out of [her] house and said 'oh, he's a stupid nigger'" to plaintiff and then told him to "just shoot the dog with a BB gun."  (Id. at 315:5–316:6.)  Plaintiff believes that Hart conspired with his neighbors in order to murder him, but there is nothing in the record to support such a claim.  (Id. at 313:17–21.)

Plaintiff did not come to work on the following Monday.  (Fabian Dep. 144:7–9.)  Over the following days there appears to have been sporadic communication between Fabian, Dorsch, and plaintiff, but the parties dispute the details of that communication.  (See Pl's 56.1 ¶¶ 256–258.)  The most salient dispute is whether plaintiff had been told that he could work from home.

Plaintiff testified that Dorsch had offered, via email, to allow him to work from home. (Williams Dep. 363:3–10.)  Plaintiff testified that he accepted Dorsch's offer and planned to return to work eventually; Fabian, on the other hand, testified that plaintiff never received any offer to work from home for an extended period of time.  (Williams Dep. 363:3–16; Fabian Dep. 147:5– 8.)  The record does not contain any email in which Dorsch offered to allow plaintiff to work from home, but it does contain an email chain between plaintiff and Fabian dated April 16, 2013, in which plaintiff stated: "I accept [Dorsch's] request to work from home."  (April 16, 2013 Email, ECF No. 52-19.)  In response, Fabian stated that "[t]he offer to work from home was applicable to yesterday and I will extend it for today.  It does not extend beyond that."  (Id.)  Plaintiff then apparently left Fabian a voicemail, after which Fabian responded via email, copying Sobel, stating: "There is no additional authorization to work from home.  You need to call me to discuss the events of Friday 4/12/13 and the follow up."  (Id.)  Plaintiff appears not to have followed up with Fabian and did not appear for work on April 17, 2013.  Four Seasons then terminated his employment. (Notice of Termination, ECF No. 51-39.)

In a Notice of Termination dated April 17, 2013, Fabian wrote to plaintiff indicating that, after "the events of Friday April 12 2013, [Four Season's] investigation has found nothing to substantiate or support the claims [plaintiff] made regarding fellow employees and the statements [plaintiff has] attributed to them."  (Id.)  Fabian also noted the "investigation into [plaintiff's] earlier claim regarding a hostile work environment failed to provide any support of the incidents,

actions or statements that [plaintiff] alleged to have transpired, except for the one incident of a possibly offensive ringtone." (Id.) Fabian then stated that the "conclusion to [Four Season's] investigation is that [plaintiff] has established a practice and pattern of making intentionally false accusations against fellow employees" and that this was "a violation of company policy" and grounds for termination. (Id.; see also Fabian Dep. 147:5–19 ("I decided that the allegations that [plaintiff] had made previously and continued to make were unfounded, that he was detrimental to the department, and that . . . his false allegations were basis enough for me to terminate him."); Sobel Dep. 166:20–167:21.) The Notice of Termination makes no specific reference to plaintiff's failure to return to work following the incident on April 12, 2013.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-

movant." Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate. Anderson, 477 U.S. at 249.

In an employment discrimination case where intent is at issue, a "trial court must be cautious about granting summary judgment to an employer." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Because direct evidence of discriminatory intent is rarely available, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Id. The Second Circuit has recognized, however, that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (alteration in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). Thus, "trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

In determining whether a genuine dispute of material fact exists, district courts cannot decide the credibility of witnesses presenting conflicting testimony "because the assessment of a

witness's credibility is a function reserved for the jury." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) (citing Scholastic, Inc. v. Harris, 259 F.3d 73, 87 (2d Cir. 2001)); see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.")

There is an exception to this general rule in "the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete." Jeffreys, 426 F.3d at 554; see also Smith v. Pub. Admin. of Suffolk Cty., No. 06-cv-3740, 2009 WL 2843281, at *8 (E.D.N.Y. Aug. 31, 2009). The Second Circuit has recognized, however, that cases alleging discrimination "tend to be particularly ill-suited to the assessment of a plaintiff's credibility at the summary judgment stage, because in such cases 'the only direct evidence available very often centers on what the defendant allegedly said or did,' and 'the defendant will rarely admit to having said or done what is alleged.'" Fincher, 604 F.3d at 726 (quoting Danzer v. Norden Sys., Inc., 151 F.3d 50, 57 (2d Cir. 1998)).

## B. Overtime, Minimum Wage, and Wage Statement Claims

Plaintiff's First through Fifth Claims are for overtime and minimum wage violations under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 190 et seq., and for failure to furnish proper wage statements under the NYLL. Plaintiff advances these claims against Four Seasons, Fabian, and Dorsch.

As an initial matter, plaintiff has not opposed summary judgment on his Second and Fourth claims for minimum wage violations, and no reasonable jury could find that any such violations occurred. (See Plaintiff's Letter to the Court dated October 16, 2015 at n. 1, ECF No. 46.) As such, defendants' motion for summary judgment on those claims is granted.

Plaintiff has also conceded that his claim for failure to furnish proper wage statements turns on whether he was properly classified as an administrative employee. (See Pl's Opp. at 10 n.6 ("to the extent that Defendants misclassified Plaintiff as an exempt employee, the wage statements that Defendants provided to him each pay period were inaccurate").) For the reasons that follow, the Court finds that plaintiff was properly classified as an administrative employee and, therefore, also grants defendants' motion for summary judgment on this claim.

Plaintiff's First and Third claims are for unpaid overtime under the FLSA and NYLL, respectively. Defendants argue that plaintiff was not entitled to overtime because he was employed in a bona fide administrative capacity and, thus, fell into an exemption from the general overtime rule. Because the scope of the "administrative employee" exemption is identical under the FLSA and NYLL, the Court considers those claims together. See Reiseck v. Universal Communications of Miami, Inc., 591 F.3d 101, 104 (2d Cir. 2010); Scarpinato v. E. Hampton Point Mgmt. Corp., No. 12-CV-3681, 2013 WL 5202656, at *13 (E.D.N.Y. Sept. 13, 2013).

Congress enacted the FLSA in 1938 in order to combat "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." In re Novartis Wage & Hour Litig., 611 F.3d 141, 150 (2d Cir. 2010) (citing 29 U.S.C. § 202(a)). In relevant part, the FLSA obligates employers to pay employees at an increased rate for any work in excess of 40 hours per week. See 29 U.S.C. § 207(a)(1). This is known as the "overtime requirement."

The FLSA also provides for a number of exemptions from the overtime requirement, including an exemption for "any employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 207(a)(1). Because the FLSA is a remedial law, the exemptions must be "narrowly construed against the employers seeking to assert them" and must be applied only in situations

"plainly and unmistakably within their terms and spirit."    Novartis, 611 F.3d at 150 (quoting Reiseck, 591 F.3d at 104); Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217, 222 (2d Cir. 2002)); see also Pippins v. KPMG, LLP, 759 F.3d 235, 238 (2d Cir. 2014).

Although the FLSA does not, itself, provide criteria for determining the scope of the administrative employee exemption, the Secretary of Labor has provided such criteria by regulation.    See 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.200 et seq.  An "employee employed in a bona fide administrative capacity" is thus defined as an employee (1) who is compensated on a salary or fee basis of no less than $455 per week, (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) "[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. §§ 541.200(a); 541.600.

Plaintiff concedes that, at all relevant times, he was compensated on a salary basis at a rate not less than $455 per week.  (See Pl's Opp. at 6 n.4.)  Plaintiff further concedes that his primary job duty is "coordinating testing to secure industry certifications of [Four Season's] products." (Id. at 11.)  Nevertheless, plaintiff argues that there exist genuine issues of material fact concerning whether his duties "required performance of general business management or was actually a production job," "required the exercise of sufficient discretion and independent judgement," and "pertained to matters of significance."  (Id. at 9–13.)

For the reasons below, the Court finds that plaintiff was properly classified as a bona fide administrative employee.

**a.  Plaintiff's "Primary Duty"**

Plaintiff concedes that his primary duty was his responsibility for coordinating and

overseeing the testing and certification of Four Seasons' products, and the Court agrees. When identifying an employee's primary duty, courts consider factors such as "the relative importance of the exempt duties as compared with other types of duties" and "the amount of time spent performing exempt work." 29 C.F.R. § 541.700(a). Although the amount of time spent on a particular duty is not determinative, it is often a useful guide: "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b).

Plaintiff spent the majority of his time on his testing and certification duties and occupied a leadership role within Four Seasons with respect to those tasks. Further, testing and certification was an important function because Four Seasons was unable to sell its products in a number of jurisdictions without the proper certification. Thus, plaintiff's role in overseeing and coordinating those certifications was more important than his other duties because it directly impacted Four Seasons' business and because plaintiff was the sole employee leading the certification efforts. The record therefore establishes that plaintiff's primary duty was his responsibility for coordinating and overseeing the testing and certification of Four Seasons' products.

It "is a strict question of law" whether an employee's primary duties, once established, exempt him from the FLSA's overtime requirements. Alberti v. Cty. of Nassau, 393 F. Supp. 2d 151, 174 (E.D.N.Y. 2005) (citing Mike v. Safeco Ins. Co. of Am., 274 F.Supp.2d 216, 220 (D. Conn. 2003); Tomney v. Int'l Ctr. for Disabled, 357 F.Supp.2d 721, 739–41 (S.D.N.Y. 2005)). Having determined that there is no genuine issue of material fact concerning plaintiff's primary duty, the Court now considers whether the qualifies as a bona fide administrative employee.

**b.  "Directly Related to Assisting with the Running or Servicing of the Business"**

In order to qualify as a bona fide administrative employee, an employee's primary duty

must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."   29 C.F.R. § 541.201(a).   By way of illustrative example, federal regulations provide that "work in functional areas such as . . . quality control; . . . research; . . . [and] legal and regulatory compliance" is "directly related with the running or servicing of the business." 29 C.F.R. § 541.201(b).

"The 'essence' of an administrative job is that an administrative employee participates in 'the running of a business, and not merely . . . the day-to-day carrying out of its affairs.'" Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009).   Administrative employees ordinarily play a role that is "related to the business's overall efficiency or mode of operation." Davis, 587 F.3d at 535.

The Second Circuit has "drawn an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business." Davis, 587 F.3d at 535. An employee's duties can generally be "classified as belonging in the administrative category, which falls squarely within the administrative exception, or as production/sales work, which does not." Davis, 587 F.3d at 531–532. This "administration/production dichotomy" serves as a useful heuristic. See, e.g., Savage v. UNITE HERE, No. 05-cv-10812, 2008 WL 1790402, *7 (S.D.N.Y. Apr. 17, 2008) (collecting cases).

Defendants argue that plaintiff's primary duties satisfy this prong of the administrative employee exception because those duties included work in various administrative areas, such as "legal and regulatory compliance; advertising; marketing; research; and safety and health." (Def. Mem. at 9.)   In opposition, plaintiff advances the entirely conclusory argument that his "tasks

simply are not core business operations" and so do not qualify him as an administrative employee. (See Pl's Opp. at 10.)  The Court finds that plaintiff's responsibilities were "directly related to assisting with the running or servicing of the business" and, therefore, satisfy the requirements of this prong of the administrative exception.

Four Seasons' business is the manufacture and sale of tangible goods, but plaintiff neither produced nor sold those goods.  Instead, plaintiff's primary duty was to coordinate the testing and certification of Four Seasons' products so as to comply with applicable regulatory requirements. As part of these duties, plaintiff played "a research and development" role and "developed a knowledge base and independent expertise" concerning testing and certification.  (Pl's 56.1 ¶¶ 59, 60, 85.)  Although he was occasionally required to interface with Four Seasons' manufacturing group, plaintiff's function was to ensure that the products met the relevant testing and certification requirements; he did not, himself, directly manufacture Four Seasons' products.  Plaintiff's primary duties were thus "directly related to assisting with the running or servicing of the business" rather than to the manufacturing or sale of Four Seasons products.

### c.   **"Discretion and Independent Judgment"**

In order to satisfy the third element, an employee's "primary duty must include the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.202(a).

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).  In order to qualify as an exercise of "discretion and independent judgment," an employee's duties "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or

other sources." 29 C.F.R. § 541.202(e). Rather, an exercise of "discretion and independent judgment" is characterized by an employee's "authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c). The regulations recognize, however, that "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level" and the exemption therefore does not require that "the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." 29 C.F.R. § 541.202(c).

Here, the parties agree that plaintiff exercised "independent expertise" concerning the testing and certification of Four Seasons' products. (Pl's 56.1 ¶¶ 59, 60, 85.) Indeed, plaintiff testified that his duties required him to apply his "independent judgment," "knowledge," and "skill." (Williams Dep 95:11–19.) The parties further agree that plaintiff was not merely applying well-established criteria to the tasks for which he was responsible. Instead, plaintiff "self-learned" because "no other employee . . . had knowledge and expertise" regarding that role. (Pl's 56.1 ¶¶ 59, 60, 85.) And, although plaintiff was ultimately subject to the oversight of his supervisors, he "did not wait to receive assignments or take cues" from his supervisors before performing duties related to the testing and certification of Four Seasons' products. (Pl's 56.1 ¶ 70.)

Plaintiff "contends that he merely coordinated [the] certification process with guidance form Fabian and others," disregarding the fact that there is no requirement that an employee have "unlimited authority." (See Pl's Opp. Mem. at 11.) Here, the considerable autonomy enjoyed by plaintiff in completing his primary duties is sufficient to qualify as an exercise of discretion and independent judgment.

The next inquiry concerns whether plaintiff exercised such discretion and independent judgment on "matters of significance." "The term 'matters of significance' refers to the level of

importance or consequence of the work performed."  29 C.F.R. § 541.202(a).  The parties agree that "[m]anaging the certification of Four Seasons' products is a very important function for Four Seasons" because it "may not legally sell its products without the requisite certification."  (Pl's 56.1 ¶¶ 40–43; 45.)  Plaintiff argues, however, that "obtaining . . . certifications are routine matters." (Pl's Opp. at 12.)  The Court disagrees; given the abundant support for the importance of plaintiff's primary duty, the Court finds that plaintiff's testing and certification duties qualify as "matters of significance."

Plaintiff is thus exempt from the overtime requirements of the FLSA and NYLL as a bona fide administrative employee.  As such, defendants' motion for summary judgment is granted with respect to plaintiff's First through Fifth claims.

Defendants have also advanced the alternative argument that plaintiff's First through Fifth Claims against Dorsch should be dismissed because Dorsch does not qualify as an "employer" so as to be subject to the FLSA and NYLL.  (Def. Mem. at 6, n.7.)  Because the Court grants defendants' motion for summary judgment with respect to these claims for the reasons stated above, the Court need not reach this alternative argument.

## C.  Plaintiff's Discrimination Claims

Plaintiff's second set of claims center around allegations of racial discrimination. Defendants have moved for summary judgment on all such claims.  Because genuine issues of material fact exist with respect to plaintiff's hostile work environment and retaliation claims, defendants' motion for summary judgment is denied with respect to those claims.  Defendants' motion for summary judgment is granted with respect to plaintiff's claim for discriminatory termination.

### a. **Hostile Work Environment Claims**

Plaintiff advances hostile work environment claims as his Sixth, Eighth, and Tenth Claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and New York Human Rights Law ("NYHRL"), respectively.   Plaintiff advances his Title VII claim only against Four Seasons, but advances his § 1981 and the NYHRL claims against all defendants.

"The elements of a hostile work environment claim under NYHRL are identical to the elements required under the equivalent federal antidiscrimination laws." Illiano v. Mineola Union Free Sch. Dist., 585 F. Supp. 2d 341, 349 (E.D.N.Y. 2008) (citing Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006)); see also Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714–15 (2d Cir. 1996).  Likewise, when analyzing § 1981 claims for hostile work environment, courts "apply the same standards as in Title VII cases."  Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000) (quoting Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 347 n.2 (7th Cir. 1999)).  The Court thus analyzes plaintiff's hostile work environment claims together.

### 1.  **Standard**

Under federal law, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment' in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).  Thus, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment' . . . Title VII is violated." Id. at 21 (quoting Meritor Savings Bank, FSB, 477 U.S. at 65, 67).

In order to prove the existence of a hostile work environment, a plaintiff must demonstrate both that "the misconduct shown [is] severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim . . . subjectively perceive[d] that environment to be abusive." Feingold v. N.Y., 366 F.3d 138, 150 (2d Cir. 2004) (internal quotations omitted); see also Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

Under the objective prong of this inquiry, the existence or non-existence of a hostile work environment must be "measured by the totality of the circumstances." Chandler v. AMR Am. Eagle Airline, 251 F. Supp. 2d 1173, 1185 (E.D.N.Y. 2003) (citing Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999)). Among the factors that courts consider are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." Feingold, 366 F.3d at 150 (quoting Harris, 510 U.S. at 23).

Generally, in order to qualify as a hostile work environment, "incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Id., 366 F.3d at 150 (quoting Alfano, 294 F.3d at 374). Courts have recognized, however, that "there is 'no fixed number of incidents that a plaintiff need endure to establish a hostile work environment claim.'" Chandler, 251 F. Supp. 2d at 1185 (quoting Alfano, 294 F.3d at 379). Indeed, even "a single act can create a hostile work environment if it in fact 'work[s] a transformation of the plaintiff's workplace.'" Feingold, 366 F.3d at 150 (quoting Alfano, 294 F.3d at 374). In particular, the Second Circuit recently noted that "the one-time use of a severe racial slur [may], by itself, support a hostile work environment claim when evaluated in the cumulative

reality of the work environment."  Daniel v. T & M Prot. Res., LLC, No. 15-cv-560, 2017 WL 1476598, at *1 (2d Cir. Apr. 25, 2017) (summary order) ("perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates") (quoting Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2014)).

In order for an employer to be held liable for the existence of a hostile work environment, there must be a "specific basis for imputing the conduct creating the hostile work environment to the employer," which turns on "who does the harassing."  Deberry v. Brookdale Univ. Hosp. & Med. Cent., No. 12-cv-6251, 2016 WL 3840673, at *6 (E.D.N.Y. July 12, 2016) (quoting Feingold, 366 F.3d at 149-50).  Where "the harassment is attributable to a coworker, rather than a supervisor, . . . the employer" is liable only if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.  Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir. 2009) (quoting Distasio v. Perkin Elmer Corp., 157 F.3d 55, 63 (2d Cir. 1998)); see also Whidbee, 223 F.3d at 72.

Where a plaintiff is harassed by his supervisor, the employer is generally liable for the resulting hostile work environment.  If "no tangible employment action [was] taken" against the plaintiff in connection with the harassing behavior, however, an employer may still avoid liability if it can demonstrate "that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013); see also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) (noting that the defense is not available "when a supervisor takes a tangible employment action against the subordinate" that "aids in the commission of the harassment"); Faragher v. Boca Raton, 524 U.S.

775 (1998).

This is known as the "Faragher/Ellerth affirmative defense." See, e.g., Townsend v. Benjamin Enterprises, Inc., 679 F.3d 41, 51 (2d Cir. 2012). For the purposes of a Faragher/Ellerth analysis, a "supervisor" is an employee "empowered by the employer to take tangible employment actions against the victim." Vance, 133 S. Ct. at 2439. A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 2442 (quoting Ellerth, 524 U.S. at 761).

### 2. Plaintiff Has Demonstrated Genuine Issues of Material Fact With Respect to the Existence of a Hostile Work Environment

Defendants have moved for summary judgment on plaintiff's hostile work environment claims against all defendants. In the alternative, defendants argue that summary judgment should be granted with respect to the claims against Four Seasons. Because plaintiff's testimony concerning the alleged incidents is contradicted by the testimony and sworn statements of his co-workers and supervisors, nearly every fact material to the hostile work environment claims is in dispute. The issue is thus one of witness credibility and is inappropriate for the Court to resolve at summary judgment. Defendants' motion is therefore denied.

Defendants ask the Court to conclude that no genuine issue of material fact exists because plaintiff's testimony is "incredible" and could not be accepted as true by any reasonable jury.[1] The Court declines to find that this is the sort of "rare circumstance" in which a district court may decide issues of witness credibility at the summary judgment phase because, among other things, plaintiff's testimony is neither internally contradictory nor incomplete. See Jeffreys v. City of

---

[1] Defendants have not argued that plaintiff's version of events, even if taken as true, is insufficient to support his hostile work environment claims. That question is therefore not before the Court.

N.Y., 426 F.3d 549, 554 (2d Cir. 2005); see also Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) (discrimination cases "tend to be particularly ill-suited to the assessment of a plaintiff's credibility at the summary judgment stage").

Defendants cite no case in which a district court granted summary judgment in a situation comparable to this one. Instead, defendants cite a number of distinguishable cases. First, several of defendants' cases concern application of 28 U.S.C. § 1915, under which the court is empowered to dismiss a case brought in forma pauperis that it finds to be "frivolous or malicious." See, e.g., Denton v. Hernandez, 504 U.S. 25, 32–33 (1992) (stating that courts may discuss such claims if they are "fanciful," "fantastic," or "delusional," meaning they are "irrational" or "wholly incredible"); McCormick v. Jackson, No. 07-cv-7893, 2008 WL 3891260 (S.D.N.Y. Aug. 21, 2008) (dismissing case under 28 U.S.C. § 1915); Gonzales v. Carpenter, No. 08–cv–629, 2011 WL 768990, at *7 (N.D.N.Y. Jan. 3, 2011) (same). Such cases are inapposite here, where plaintiff is not proceeding in forma pauperis. And, in any event, plaintiff's claims are neither frivolous nor malicious under the meaning of 28 U.S.C. § 1915.

Even the cases cited by defendants that do not rely on the in forma pauperis statute are distinguishable from the instant case because they concern unsupported, absurd, and highly improbable claims. See Gonzalez v. Lempke, No. 08-cv-6299, 2014 WL 4244343, at *4 (W.D.N.Y. Aug. 26, 2014) (granting an unopposed motion for summary judgment on incarcerated pro se plaintiff's "fanciful and delusional claims" that prison officials "harmed him with a laser ray and with substances through the ventilation system in his cell"); Tyler v. Carter, 151 F.R.D. 537, 540 (S.D.N.Y. 1993) (granting motion to dismiss pro se plaintiff's complaint alleging "a bizarre conspiracy . . . to enslave and oppress certain segments of our society," which was premised on claims that plaintiff "is a cyborg"); Friedman v. Self Help Community Services,

11-cv-3210, 2015 WL 1246538, at *14 (E.D.N.Y. Mar. 17, 2015) (granting motion to dismiss pro se complaint premised on an "absurd theory" that plaintiff's relatives conspired with the city government to have plaintiff wrongfully arrested and committed in a psychiatric ward) (adopting report and recommendation).

Although plaintiff's sworn testimony may be contradicted by other evidence and undermined by the testimony of his treating physician, those are issues that go to his credibility. Plaintiff's testimony is not so fanciful as to warrant a judicial determination that no reasonable jury could accept it. Neither is it "replete with the level of contradictions and inconsistencies which would cast doubt upon its plausibility." Smith v. Pub. Admin. of Suffolk Cty., No. 06-cv-3740, 2009 WL 2843281, at *8 (E.D.N.Y. Aug. 31, 2009). There is thus sufficient evidence in the record from which a reasonably jury could conclude that plaintiff was subjected to a hostile work environment.

### 3. Plaintiff Has Demonstrated a Genuine Issue of Material Fact With Respect to Four Seasons' Liability for the Hostile Work Environment

Defendants also argue, in the alternative, that the Court must grant summary judgment on the hostile work environment claim against Four Seasons because "the individual defendants to whom Plaintiff ascribes discriminatory conduct were his co-workers," rather than his supervisors.[2] (Def. Mem. at 21.) Where "harassment is attributable to a coworker, rather than a supervisor, . . . the employer" is liable only if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. Duch, 588 F.3d at 762; Whidbee, 223 F.3d at 72.

In arguing that Four Seasons cannot be held liable for the allegedly hostile work environment created by co-workers, defendants gloss over two areas of genuine dispute. First, the

---

[2] Defendants have not moved on for summary judgment on the hostile work environment claims against any individual defendant. For that reason, the question whether the conduct of any individual defendant was, itself, sufficiently severe or pervasive so as to create a hostile work environment is not before the Court.

parties dispute the regularity with which Dorsch exercised his supervisory authority over plaintiff and whether Dorsch possessed the authority either to hire or fire plaintiff or to determine plaintiff's salary.  (See, e.g., Pl's 56.1 ¶¶ 27–32.)  That is, there are factual disputes concerning whether Dorsch was plaintiff's supervisor, and defendants fail even to address this issue.

Second, the parties dispute whether Dorsch was involved in the alleged harassment. (See, e.g., Williams Complaint Letter (stating that Dorsch was involved, to some degree, in at least three of the alleged incidents).)  Although the record indicates that Dorsch played, at most, a minor role, the incidents involved the alleged use of "an unambiguously racial epithet" that the Second Circuit has noted to be capable of "quickly alter[ing] the conditions of employment and creat[ing] an abusive working environment."  Daniel, 2017 WL 1476598, at *1 (quoting Rivera, 743 F.3d at 24).  Beyond arguing that all of plaintiff's testimony should be dismissed as incredible, defendants do not address Dorsch's alleged involvement.

There thus exist genuine issues of material fact concerning whether plaintiff was subject to harassment by a supervisor.  As such, Four Seasons cannot avail itself of its requested defense, which is applicable only where the harassment at issue arose solely from the conduct of co-workers.

In its opposition, plaintiff appears to assume that defendants attempted to advance the Faragher/Ellerth affirmative defense, which may be available where an employee had been subjected to harassment by his supervisor.  Plaintiff argues that "the Faragher/Ellerth defense simply does not apply because Plaintiff suffered an adverse action as a result of the racial discrimination—Defendants terminated his employment." (Pl's Opp. at 19.)  Defendants have not, however, advanced a Faragher/Ellerth defense.  Indeed, defendants have cited neither Faragher nor Ellerth in their motion papers and, as noted above, have failed even to address whether plaintiff was subjected to harassment by a supervisor, instead proceeding solely on their argument that Four

Seasons cannot be liable for co-worker harassment. Thus, the question whether the Faragher/Ellerth defense may be available to Four Seasons is not before the Court.[3]

### b. **Discriminatory Termination**

In addition to the hostile work environment claim discussed above, plaintiff's Sixth Claim also includes a distinct claim against Four Seasons for discriminatory termination under Title VII. (See Compl. ¶ 88.)  Four Seasons has moved for summary judgment on this claim, arguing that plaintiff "has failed to set forth one iota of evidence . . . to create an inference that his termination was discriminatory."  (Def. Mem. at 23.)  The Court agrees and grants summary judgment on plaintiff's discriminatory termination claim.

A discriminatory termination claim under Title VII is analyzed under the burden-shifting framework set out by the Supreme Court in McDonnell Douglas.  See, e.g., Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  Under that framework, a plaintiff first bears the burden of establishing a prima facie case of discrimination.  Id.  "In the context of an alleged discriminatory discharge, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination."  Id. at 491–92.  If a plaintiff can satisfy this initial burden, the defendant must then offer a legitimate, non-discriminatory reason for the termination.  Id. at 492.  If the defendant can do so, the burden shifts back to the plaintiff to show that the proffered reason was pretextual and "the real reason for plaintiff's termination was his race."  Id.

---

[3] As noted below, no reasonable jury could find that racial discrimination played a role in plaintiff's termination and defendants' motion for summary judgement is thus granted with respect to plaintiff's claim of discriminatory termination.  Therefore, the Faragher/Ellerth defense may still be available to Four Seasons.

Defendant argues that plaintiff has failed to satisfy the fourth requirement of the prima facie stage of the <u>McDonnell Douglas</u> analysis, arguing that "other than the fact that Plaintiff is a Black male, and was selected for termination, Plaintiff has not presented any evidence that the reasons for his termination were discriminatory."  (Def. Mem. at 23.)

Although there are genuine disputes of material fact with respect to the existence of a hostile work environment, there are no such disputes with respect to whether plaintiff's termination was discriminatory.  Indeed, plaintiff does not allege that he heard any comments concerning race in connection with the events ultimately leading to his termination.[4]  Further, Fabian and Sobel were solely responsible for the decision to terminate plaintiff.  Since neither Fabian nor Sobel played any part in the conduct allegedly underlying plaintiff's hostile work environment claim, the fact that they were responsible for the termination decision—rather than other employees who <u>were</u> alleged to have participated in the earlier harassment—weighs against an "inference of discrimination."[5]

In short, no reasonable jury could find that plaintiff was terminated under circumstances giving rise to an inference of discrimination.  Therefore, plaintiff has failed to demonstrate a prima facie case of discriminatory termination and defendants' motion for summary judgment is granted with respect to that claim.

c.  **<u>Retaliation Claims</u>**

Plaintiff's Seventh, Ninth, and Eleventh Claims are for retaliation under Title VII, § 1981,

---

[4] Although plaintiff testified that his neighbors directed racial epithets at him on the weekend of April 13, 2013, there is no evidence whatsoever linking those alleged comments either to any defendant or to the decision to terminate plaintiff's employment.

[5] At most—and as discussed below—the record may support a finding that plaintiff was terminated in retaliation for his earlier complaints concerning a hostile work environment.  While a reasonable jury could find that plaintiff's termination was retaliatory, that question is distinct from the question whether his termination was, itself, motivated by discrimination.

and the NYHRL, respectively.  Plaintiff advances his claim under Title VII only against Four Seasons, but advances his claims under § 1981 and the NYHRL against all defendants.  Plaintiff argues that defendants retaliated against him both by calling the police after the incident on April 12, 2013, and by terminating his employment on April 17, 2013.  (See Compl. ¶ 102.)

Retaliation claims under Title VII, § 1981, and the NYHRL are subject to identical analyses.  See Van Zant, 80 F.3d at 715–16; Fincher, 604 F.3d at 720; Bowen-Hooks v. City of N.Y., 13 F. Supp. 3d 179, 220 (E.D.N.Y. 2014).  Claims for retaliation are "analyzed under a modified version of the McDonnell Douglas test."  Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 n.6 (2d Cir. 2011) (citing Hicks v. Baines, 593 F.3d 159, 164–65 (2d Cir. 2010)); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).  Under that test, plaintiff bears the initial burden of establishing "a prima facie case of retaliation by showing: (1) his participation in protected activity; (2) defendant's knowledge thereof; (3) materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  Tepperwien, 663 F.3d at 568 n.6.

If plaintiff states a prima facie case, "the burden shifts to defendants to state a legitimate non-discriminatory reason" for the allegedly retaliatory action.  Feingold, 366 F.3d at 157.  If the defendant is able to articulate a non-discriminatory reason, "the burden shifts back to the plaintiff to prove that retaliation was a substantial reason for the adverse action" and that the proffered reason was a mere pretext.  Tepperwien, 663 F.3d at 568 n.6.

### 1.  There Are Genuine Issues of Material Fact With Respect Plaintiff's Retaliation Claim

Defendants' advance their argument in support of summary judgment on plaintiff's retaliation claim entirely in a footnote on the final page of their brief.  (See Def. Mem. at 25 n.20.)  Defendants argue that plaintiff "cannot satisfy his burden of demonstrating that the purported acts

of retaliation, i.e. his termination, was in any way connected to any alleged protected activity" and that defendants "have produced irrefutable evidence that Plaintiff was terminated for legitimate, non-retaliatory reasons." (Id.)  The Court disagrees and finds that genuine issues of material fact preclude the Court from granting defendants' motion for summary judgment.

Defendants' argument that plaintiff's termination was not "in any way connected to any alleged protected activity" strikes the Court as disingenuous.  Indeed, in the Notice of Termination sent to plaintiff, Fabian explicitly linked plaintiff's termination to his earlier complaints.  (See Notice of Termination.)  Thus, plaintiff has demonstrated a prima facie case of retaliation stemming from his termination.[6]

As a legitimate, non-retaliatory rationale for plaintiff's termination, defendants argue that "Four Seasons' decision to terminate Plaintiff was ultimately because (i) Plaintiff had issued false and serious allegations against his co-workers that they were conspiring to kill him and his dog, and (ii) Plaintiff failed to respond to Four Seasons' requests to discuss the issues." (Def. Mem. at 24.)  The Notice of Termination, however, makes no reference to plaintiff's failure to return to work following the incident on April 12, 2013.  Rather, the Notice mentions only plaintiff's "practice and pattern of making intentionally false accusations against fellow employees." (Notice of Termination.)

A reasonable jury could find that defendants' proffered rationale was merely pretextual and that the termination was, in reality, a retaliation for plaintiff's earlier complaints.  The existence of genuine issues of material fact thus warrants the denial of defendants' motion for summary judgment on plaintiff's retaliation claims.

---

[6] Defendants have not moved for summary judgment on plaintiff's retaliation claim premised on the decision to call the police on April 12, 2013.  (See Compl. ¶ 102.)  Although the Court has significant doubts concerning whether the decision to call the police might constitute a "materially adverse employment action" sufficient to support a retaliation claim, that question is not before the Court.

###### d.  **Aiding and Abetting**

Plaintiff advances his Twelfth Claim, for aiding and abetting the alleged violations of the NYHRL, against all of the individual defendants.  Section 296(6) of the NYHRL makes it unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYHRL], or attempt to do so."  NYHRL § 296(6); see also Lewis v. Triborough Bridge & Tunnel Auth., No. 97-cv-0607, 2001 WL 46986, at *1 (S.D.N.Y. Jan. 18, 2001), aff'd, 31 F. App'x 746 (2d Cir. 2002).  Liability for aiding and abetting requires the existence of a primary NYSHRL violation.  See Dewitt v. Lieberman, 48 F.Supp.2d 280, 294 (S.D.N.Y. 1999); Greene v. St. Elizabeth's Hospital, 66 N.Y.2d 684 (N.Y. 1985).

As noted above, plaintiff has established genuine issues of material fact concerning defendants' liability for the hostile work environment and retaliation claims under the NYHRL. For the same reasons, plaintiff has also established genuine issues of material fact concerning aiding and abetting liability for those violations.  Defendants' motion for summary judgment on plaintiff's aiding and abetting claims is therefore denied.

### III.    CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted with respect to plaintiff's First through Fifth Claims.  Defendants' motion for summary judgment is also granted with respect to plaintiff's Sixth Claim for employment discrimination insofar as it is premised on plaintiff's termination.  Defendants' motion for summary judgment is denied with respect to plaintiff's remaining claims.

Trial on the remaining claims will begin at 9:30 AM on July 31, 2017, in Courtroom 920 of the Long Island Courthouse.  The parties are directed to file their joint proposed pre-trial order and proposed jury instructions by no later than June 22, 2017.  A pre-trial conference is scheduled for 10:30 AM on June 29, 2017, in Courtroom 920 of the Long Island Courthouse.

**SO ORDERED.**

Date: May 31, 2017
Central Islip, New York

_____/s/ (JMA)_____
Joan M. Azrack
United States District Judge

34